1
2
3
4
5
6
7
8                 **UNITED STATES DISTRICT COURT**
9                     **DISTRICT OF NEVADA**
10

11 SALLY MERRITT, an individual,   )    3:11-cv-00312-HDM-WGC
                                 )
12                Plaintiff,    )
                                 )    ORDER
13 vs.                        )
                                 )
14 HARRAH'S ENTERTAINMENT, INC., a  )
Nevada corporation,           )
15                                )
               Defendant.    )
16 _____ )

17     Before the court is the defendant's motion for summary

18 judgment (#15).  Plaintiff filed a complaint in the Second Judicial

19 District Court for the State Nevada in and for Washoe County,

20 alleging violations of the Americans with Disabilities Act ("ADA"),

21 Age Discrimination in Employment Act ("ADEA"), interference with

22 the Family Medical Leave Act ("FMLA"), breach of implied covenant

23 of good faith and fair dealing in contract and tortious breach of

24 good faith and fair dealing in contract against the defendant.  (#1

25 Ex. A).  Defendant removed the action to this court based on

26 federal question jurisdiction (#1).  Defendant moved for summary

27 judgment on all claims (#15), plaintiff opposed (#19) and defendant

28 replied (#21).  For the reasons set forth below, the defendant's

motion for summary judgment on plaintiff's ADA, ADEA and tortious breach of contract claims shall be **GRANTED**.  Defendant's motion for summary judgment on plaintiff's interference with FMLA and ordinary breach of contract claims shall be **DENIED**.

### I. Facts

Plaintiff, Sally Merritt ("Merritt"), is a 63 year-old former employee of defendant Harrah's Entertainment, Inc. ("Harrah's"). (Def.'s Mot. Summ. J., Decl. Susan Heaney Hilden ("Hilden Decl.") Ex. 1 ("Pl.'s Dep."), 8:12-20 ).  Merritt was hired by Harrah's as a casino host in July 2004 when she was 54 years old.  (Pl.'s Dep. 8:16-20).  Merritt suffers from lupus, chronic Epstein Barr, asthma, joint problems and feet problems.  (Pl.'s Dep. 76:24-77:1). At times, her health problems caused her to be away from work. When Merritt was hired, she informed Harrah's that she suffered from lupus and foot problems and that her lupus was likely going to get worse.  (Pl.'s Dep. 52:5-12).  Moreover, Merritt informed Harrah's that when her lupus flares-up, it incapacitates her and she could not predict how often she would have to take leave. (*Id.*).  Thus, Harrah's was aware that Merritt would likely need to take unpredictable periods of medical leave.

In addition to the statutorily required FMLA leave, Harrah's leave policy outlines two other avenues for employees to take medical leave.  (Hilden Decl. Ex. 2).  These policies are found in Harrahs' employee handbook, which was provided to Merritt.  (Pl.'s Dep. 36:4-11).  The policy provides for twelve weeks of FMLA leave per twelve-month period.  (Hilden Decl. Ex. 2).  After five years of employment, Harrahs' employees are entitled to up to fourteen weeks of Harrah's Medical Leave ("HML-5").  (*Id.*).  And, Harrahs'

2

employees may apply for up to six weeks of personal leave.  (*Id.*).

Significantly, the decision to grant personal leave is based on

business demands and must be approved by both the department head

and human resources–a distinguishing characteristic from FMLA and

HML-5.  (*Id.*).  This dual-approval requirement is clearly stated in

the employee handbook, personal leave form and accompanying policy.

(*Id.*; Hilden Decl. Ex. 14).

   In March of 2005, Merritt was promoted to executive casino

host ("ECH"), which is the position she occupied until her

termination from Harrah's.  (Pl.'s Dep. 8:21-22).  The ECH position

involved meeting and greeting guests, making telephone contacts

with guests, working on programs to bring guests into the casino,

and running various guest special events in the casino.  (Pl.'s

Dep. 11:15-20).  Furthermore, the position required Merritt to be

on her feet most of the day.  *See* (Pl.'s Dep. 46:12-14, 50:1-8).

As such, Merritt contends she could not work when her foot problems

were aggravated.

   On May 26, 2006, Merritt submitted a request for FMLA leave

from August 1, 2006 to September 1, 2006, along with documentation

from her orthopedic surgeon, stating that she would need to take

leave for four to six weeks due to foot pain and surgery.  (Pl.'s

Dep. 12:11-13:4; Hilden Decl. Exs. 3-5).  Harrah's granted this

request for leave.  (Pl.'s Dep. 12:8-10).  Merritt did not return

to work until four months later, in late November 2006, due to

continued foot problems.  (Pl.'s Dep. 14:11-17; Hilden Decl. Ex.

6).

   Merritt again requested leave from February 6, 2007 to March

19, 2007, due to continued foot problems and surgery.  (Pl.'s Dep.

3

1   15:15-18; Hilden Decl. Exs. 7-8).  Harrah's granted this leave

2   request.  (Pl.'s Dep. 15:16-20).  Merritt subsequently extended her

3   request until May 1, 2007 because her foot was not healing.  (Pl.'s

4   Dep. 16:3-11).  Harrah's granted this request as well.  (Pl.'s Dep.

5   16:12-13).

6        In 2008, Merritt submitted a request for intermittent leave.

7   (Pl.'s Dep. 16:17-17:5; Hilden Decl. Ex. 9).  This request was

8   granted.  (Pl.'s Dep. 17:8-9).

9        Merritt requested further FMLA leave from July 2 to July 15,

10  2009, to recover from yet another surgery.  (Pl.'s Dep. 18:8-19:11;

11  Hilden Decl. Exs. 10-11).  Merritt later requested an extension

12  until December 8, 2009.  (Pl.'s Dep. 25:10-18).  Harrah's granted

13  this request.  (Pl.'s Dep. 25:13-18).  Upon Merritt's return from

14  leave in 2009, she took a number of sick days.  (Pl.'s Dep. 27:14-

15  18).

16       On April 25, 2010, Merritt emailed her manager, Stacey Wagner

17  ("Wagner"), informing him that she was suffering from foot pain

18  again, that she had difficulty walking, and she was going to need

19  to take some time off to visit the doctor.  (Pl.'s Dep. 27:23-

20  28:13).  The following day, Merritt spoke by telephone with Amilia

21  Culpepper ("Culpepper"), a member of Harrah's Risk Management

22  department and informed Culpepper that she was directed by her

23  doctor to stay off work.  (Pl.'s Dep. 28:22-29:3).  Culpepper

24  authorized the leave.  (Pl.'s Dep. 28:22-29:6).  A subsequent note

25  from Merritt's doctor, submitted by Merritt, stated that she had

26  continued foot problems and she would be able to return to work

27  without restrictions on May 3, 2010.  (Pl.'s Dep. 29:11-24; Hilden

28  Decl. Ex. 12).  Merritt was granted this leave.  (Pl.'s Dep. 29:25-

4

30:2).

On May 3, 2010, Merritt telephoned Culpepper and left a message that stated she needed to be away from work a few more days, and should be released to work on May 6, 2010.  (Pl.'s Dep. 30:14-21).

On May 5, 2010, Merritt submitted a request to extend her leave until May 17, 2010 because she continued to have severe foot pain.  (Pl.'s Dep. 31:2-12).  Harrah's granted this request. (Pl.'s Dep. 31:13-14).

On May 12, 2010, Merritt contacted her doctor for a note extending her leave until May 31, 2010.  (Pl.'s Dep. 32:15-19). That same day, Merritt left a message with Culpepper stating that she may be out until the end of the month for medical reasons. (Pl.'s Dep. 32:20-23).  Later that day, Culpepper informed Merritt that she had exhausted her FMLA leave, and in two weeks she would exhaust all of her HML-5 leave.  (Pl.'s Dep. 32:24-33:6). Culpepper informed Merritt that she could apply for an additional six weeks of personal leave and she would send her a personal leave request form to complete.  (Pl.'s Dep. 33:7-9).  Merritt told Culpepper that she was unsure if she could continue to perform her job duties and wondered if the department would just buy out her contract.  (Pl.'s Dep. 33:10-13).  Merritt felt that because of her lupus and increasing problems, she could not perform her job and it may be best if she just left her employment.  (Pl.'s Dep. 33:14-19).

Culpepper's May 12, 2010 letter stated that Merritt had exhausted her FMLA leave and would soon exhaust her additional HML-

5 leave.[1]   (Pl.'s Dep. 37:7-39:9; Hilden Decl. Ex. 13).
Additionally, the letter stated that Merritt might be eligible for
personal leave.  (Hilden Decl. Ex. 13).  A Personal Leave of
Absence policy and form was included, which stated that personal
leave was granted at the discretion of the department manager and
human resources and was based on business demands.  (Pl.'s Dep.
38:15-22; Hilden Decl. Ex. 14).  The policy states that there is no
guarantee leave will be granted and Merritt understood that.
(Hilden Decl. Ex. 14; Pl.'s Dep. 38:2-10).

Merritt submitted her request for personal leave on
approximately May 18 or 19, 2010.  (Hilden Decl. Ex. 15).
Merritt's request stated that she needed the personal leave for
medical reasons, however, she did not include an anticipated date
of return.[2]  (Pl.'s Dep. 39:12-40:9; Hilden Decl. Ex. 15).  Merritt
spoke with Culpepper on May 21, 2010 and informed Culpepper that
she had submitted her Personal Leave Request.  (Pl.'s Dep. 41:15-
21).  Merritt inquired if her job was in jeopardy.  (*Id.*).  Merritt
stated that she had requested a severance package, but she was
still waiting to hear back from the department.  (Pl.'s Dep. 41:22-
25).  Culpepper told Merritt that severance was discretionary with
the department and any issues should be brought to the department's
attention.  (Pl.'s Dep. 42:1-4).

According to Harrah's, Vice President of Human Resources and
Risk Management, Matt Krystofiak ("Krystofiak") spoke with Wagner

---

[1] Documents provided by Harrah's show that Merritt took her first FMLA leave
of the year on July 2, 2009 and exhausted it by September 28, 2009.  Merritt took
her first HML-5 leave on September 29, 2009 and exhausted it as of May 23, 2010.
(Def.'s Mot. Summ. J., Decl. Matt Krystofiak ("Krystofiak Decl.") Ex. A).

[2] Merritt's exact response was: "?/to be determined."  (Hilden Decl. Ex. 15).

regarding the business needs of his department to determine whether
to grant Merritt her personal leave request.  (Krystofiak Decl. ¶
4).  Wagner allegedly indicated that his department was entering
the busy season and could not be without a casino host much
longer.[3]  (*Id.*).

On May 24, 2010, Merritt's podiatrist provided documentation
indicating that he had evaluated Merritt for foot pain that day and
was restricting her from work at least until June 30, 2010.
(Hilden Decl. Ex. 16; Pl.'s Dep. 47:10-48:3).  On June 30th,
Merritt's podiatrist would reevaluate her to see if she could
return to work. (*Id.*).

Harrah's Manager of Risk Management, Chris Hill ("Hill"),
discussed Merritt's personal leave request with Krystofiak.
(Def.'s Mot. Summ. J., Decl. Chris Hill ("Hill Decl.") ¶¶ 2, 4).
Hill allegedly indicated that Merritt had used all FMLA and
Harrah's medical leave and was requesting additional personal
leave.  (Hill Decl. ¶ 4).  Krystofiak allegedly told Hill that
since Merritt's department was entering a very busy period,
Harrah's could not grant the personal leave request.  (Krystofiak
Decl. ¶ 5; Hill Decl. ¶ 4).  Krystofiak allegedly told Hill that
Merritt would need to return to work or provide information from
her doctor with her specific restrictions and seek an accommodation
to return to work with restrictions.  (*Id.*).

On May 25, 2010, Hill called Merritt to tell her that her
request for personal leave had been denied based on the business

---

[3] In her opposition(#19), Merritt claims that this conversation is hearsay.
The court disagrees. The conversation is offered to prove the conversation took
place, not whether the department was actually busy.  *See* FRE 801(c).

demands of the department and her employment with Harrah's would be severed. (Pl.'s Dep. 48:15-49:4; Hill Decl. ¶ 5). Merritt disputes that Hill told her that her personal leave request was denied and adds that Hill gave her no reason for her termination. (Pl.'s Compl.; Pl.'s Opp'n Def.'s Mot. Summ. J., Decl. Sally Merritt ("Merritt Decl."), 2; Pl.'s Dep. 48:20-49:7). Merritt allegedly advised Hill that she could not return to work. (Hill Decl. ¶ 5). Hill claims that he explained to Merritt that she had exhausted all of her available leave time and this would be confirmed by letter. (*Id.*).

A May 25, 2010 letter from Hill to Merritt memorialized Harrah's decision. (Pl.'s Dep. 51:2-13; Hilden Decl. Ex. 17; Hill Decl. ¶ 6). The letter states that because Merritt had exhausted all of her FMLA and HML-5 leave and had not been released to work with or without an accommodation, her employment was being separated effective May 24, 2010. (Pl.'s Dep. 51:2-11; Hilden Decl. Ex. 17; Hill Decl. ¶ 6). The letter did not state that Merritt's request for personal leave was denied. *See* (Hilden Decl. Ex. 17). It is Harrah's position that at no point during Merritt's conversation with Hill, or in a subsequent conversation with Hill and Krystofiak, did Merritt seek an accommodation. (Krystofiak Decl. ¶ 6; Hill Decl. ¶ 7). Merritt disputes this and asserts that Harrah's never offered to engage her in the accommodation process. (Merritt Decl., 2).

In a telephone conversation with Krystofiak on or about May 26 or 27, 2010, Merritt discussed her termination and her request for severance pay. (Pl.'s Dep. 43:14-44:7). During this conversation, Merritt indicated that she was in severe pain and could not work

and was requesting a severance package.  (Pl.'s Dep. 43:14-44:1).
Krystofiak told Merritt that she was not entitled to severance pay.
(Pl.'s Dep. 44:8-10).  In a conference call between Merritt, Hill
and Krystofiak, however, Merritt claims she did ask if there was
another position within Harrah's where she would not be required to
be constantly on her feet.  (Pl.'s Dep. 49:9-50:8).  Hill and
Krystofiak deny that Merritt made this request.  (Hill Decl. ¶ 7;
Krystofiak Decl. ¶ 6).  They claim that Merritt indicated that she
was in severe pain and could not work and was seeking a severance
package.  (Hill Decl. ¶ 7).

In a telephone conversation with Wagner, Merritt reiterated
her request for severance pay.  (Pl.'s Dep. 44:22-45:10).  Wagner
told Merritt that he would discuss the request with his boss.
(Pl.'s Dep. 45:16-17).  Merritt also asked if Wagner would look
into a position in the sales department.  (Pl.'s Dep. 53:3-20).
Merritt never applied for the position, although she claims it was
because Wagner told her he didn't think she would be qualified due
to her absenteeism.  (Pl.'s Dep. 53:21-24).

Thereafter, Merritt and Wagner participated in a conference
call with Wagner's boss, Anne Chen ("Chen").  Chen reiterated
Krystofiak's statement that Merritt was not entitled to severance
pay.  (Pl.'s Dep. 45:24-46:10).  Merritt requested Chen to go
through her contract with her, but Chen told Merritt that she did
not have the contract in front of her.  (*Id.*).  Furthermore, Chen
explained that since Harrah's was not eliminating Merritt's
position, she was not eligible for severance pay.  (*Id.*).  Merritt
then asked if they could find her another position with Harrah's

where she would not be on her feet all day.  (Pl.'s Dep. 46:12-15).
Wagner stated he would look into it.  (*Id.*).  Merritt followed up
by leaving Wagner a telephone message, but did not take any further
action.  (Pl.'s Dep. 46:16-25).

On March 29, 2011, Merritt applied for Social Security
Disability Insurance Benefits ("SSDI"), claiming that she had
become disabled and unable to work on April 26, 2010 and that she
remains unable to work.  (Hilden Decl. Ex. 18).

On April 4, 2011, this lawsuit was filed. (#1 Ex. A).

**II. Summary Judgment Standard**

Summary judgment "shall be rendered if the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c).  The burden of demonstrating the absence of a genuine
issue of material fact lies with the moving party, and for this
purpose, the material lodged by the moving party must be viewed in
the light most favorable to the nonmoving party.  *Adickes v. S.H.
Kress & Co.*, 398 U.S. 144, 157 (1970); *Martinez v. City of Los
Angeles*, 141 F.3d 1373, 1378 (9th Cir. 1998).  A material issue of
fact is one that affects the outcome of the litigation and requires
a trial to resolve the differing versions of the truth.  *Lynn v.
Sheet Metal Workers Int'l Ass'n,* 804 F.2d 1472, 1483 (9th Cir.
1986); *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir.
1982).

Once the moving party presents evidence that would call for
judgment as a matter of law at trial if left uncontroverted, the

10

respondent must show by specific facts the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . . to grant summary judgment."). Moreover, "[i]f the factual context makes the non-moving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show there is a genuine issue for trial." *Blue Ridge Insurance Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998) (citing *Cal. Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)). Conclusory allegations that are unsupported by factual data cannot defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Finally, if the nonmoving party fails to present an adequate opposition to a summary judgment motion, the court need not search

11

the entire record for evidence that demonstrates the existence of a genuine issue of fact.  *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029-31 (9th Cir. 2001) (holding that "the district court may determine whether there is a genuine issue of fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers"). The district court need not "scour the record in search of a genuine issue of triable fact," but rather must "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir.1995)).  "[The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts.  But if the nonmoving party fails to discharge that burden-for example by remaining silent-its opportunity is waived and its case wagered." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).

**III. Discussion**

**A. Disability Discrimination**

Merritt's ADA claim fails as a matter of law.  The ADA prohibits an employer from discriminating against a "qualified individual" on the basis of a disability with regards to discharge or failure to make reasonable accommodations to the known physical limitations of that otherwise "qualified individual."  42 U.S.C.A. § 12112(a),(b)(5)(A).  In order to make a prima facie case under the ADA, a plaintiff must prove: 1) she is disabled; 2) she is

qualified; and 3) she suffered an adverse employment action because of her disability.  *Snead v. Metro. Prop. & Cas. Ins., Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001).  Merritt has not met her prima facie burden because she failed to show she is a "qualified individual" with a disability.

Merritt is a disabled person under the ADA.  A person is disabled under the ADA if she suffers "a physical or mental impairment that substantially limits one or more major life activities" of her person.  § 12102(1)(A).  Standing and walking are major life activities.  § 12102(2)(A).

> [S]ubstantially limits means . . . [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R § 1630.2(j)(ii).  Merritt's foot problems and lupus constitute a disability because she could not stand or walk for long periods of time, she required multiple foot surgeries and was absent from work for substantial periods during her recovery.

Merritt, however, was not a "qualified individual" under the ADA.  A "qualified individual" under the ADA is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1).  Factors to be considered include, but are not limited to: the employer's judgment about

13

which functions are essential, the work experience of past
incumbents in the job and/or current work experience of incumbents
in similar jobs.  § 1630.2(n)(3).

Merritt has failed to show that she was a "qualified
individual" because she could not attend work, and she therefore
could not perform an essential function of her position.  Regular
attendance may be an essential job function.  *See Nesser v. Trans
World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998); *Hypes v.
First Commerce Corp.*, 134 F.3d 721, 726 (5th Cir. 1998); *Rogers v.
Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996).
Merritt understood that attendance was a essential function of her
position at Harrah's.  (Pl.'s Dep. 35:9-12).  As of May 24, 2010,
Merritt's doctor had not released her to return to work until at
least June 30, 2010 and Merritt was not entitled to any further
leave.  (Pl.'s Dep. 48:9-14; Krystofiak Decl. Ex. A).  In fact,
Merritt requested a severance package because she admittedly could
no longer work.[4]  *See* (Pl.'s Dep. 33:10-13).

Additionally, Merritt filed an application for SSDI benefits,
claiming she had been unable to work because of her disability
since at least April 26, 2010.  (Hilden Decl. Ex. 18).  Merritt's
SSDI application is a factor in considering whether she was a
"qualified individual" under the ADA.  *Cleveland v. Policy
Management Systems, Corp.*, 526 U.S. 795, 802-03 (1999).

An ADA plaintiff bears the burden of proving that she is
a "qualified individual with a disability" . . . . And a

---

[4] Merritt "felt that because of [her] lupus and the increasing problems [she] had, [she] felt bad that [she] wasn't there to do [her] job, and [she] said maybe it would be best if [she] just [left]."  (Pl.'s Dep. 33:15-18).

14

> plaintiff's sworn assertion in an application for disability benefits that is, for example, "unable to work" will appear to negate an essential element of her ADA case-at least if she does not offer a sufficient explanation.  For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim.  Rather she must proffer a sufficient explanation.

*Id.* at 806.  Merritt has offered little explanation for her SSDI application, except to state that "[p]laintiff's SSDI application is not dispositive, but is a factor to be considered by the jury" (Pl.'s Opp'n Def.'s Mot. Summ. J., 4 (citing *Cleveland*, 526 U.S. 795)).  While partially accurate, Merritt's explanation does not create a genuine issue of material fact on whether she was a "qualified individual" with a disability.  Her sworn application stated that she was unable to work because of her disability at the time of her termination.

Furthermore, personal leave was not a reasonable accommodation because attendance was an essential function of Merritt's position. Merritt could not be absent while at the same time perform the essential functions of her position.

Therefore, there is insufficient evidence to support a finding that a material issue of fact exists that would establish that Merritt was a qualified individual with a disability.

**B. Age Discrimination**

Merritt's age discrimination claim also fails as a matter of law.  The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C.A. § 623(a).  This prohibition is "limited to individuals who are at least 40 years of age."  § 631(a).  The *McDonnell*

15

*Douglas* test framework applies to ADEA claims at the summary judgment stage. *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012).[5] "[T]o survive summary judgment on [her] claim for a violation of the ADEA, [plaintiff] must first establish a prima facie case of age discrimination." *Id.* at 608 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1280-81 (9th Cir. 2000). To make a prima facie case using circumstantial evidence, a plaintiff must demonstrate that she was: 1) over 40 years old; 2) performing her job satisfactorily; 3) discharged; and 4) replaced by a substantially younger person. *Coleman*, 232 F.3d at 1281 (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1997). "'The requisite degree of proof necessary to establish a prima facie case for . . . ADEA claims on summary judgment is minimal.'" *Coleman*, 232 F.3d at 1281 (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). Once a plaintiff establishes a prima facie case of age discrimination, the burden then shifts to defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *Id.* Then, plaintiff must demonstrate that the defendant's alleged reason for termination was a pretext for another motive, which is discriminatory. *Id.* Merritt fails to raise a genuine issue of material fact as to whether she was terminated based on her age.

First, it is undisputed that Merritt is a member of a

---

[5] Defendant asserts in its motion for summary judgment (#15) that plaintiff must prove that her age was the "but-for" cause for her termination. *Gross v. FBL Financial*, 129 S. Ct. 2343, 2351 (2009). The Ninth Circuit, however, recently declined to extend *Gross* to summary judgment motions such as the one before this court. *Shelley*, 566 F.3d at 607.

protected class.  She was 61 years old when she was terminated from Harrah's.  (Pl.'s Compl., 1).  Second, by all accounts, she was performing her job satisfactorily.  (*Id.*).  Third, Merritt was discharged on May 24, 2010.  (Hilden Decl. Ex. 17).

     To support the fourth element of her prima facie case, Merritt cites to a number of instances where she claims Harrah's discriminated against her because of her age.  First, Merritt states that younger employees were given more assignments than she received.  Particularly, she states that "older workers[']" duties were absorbed by younger persons."  (Pl.'s Opp'n Def.'s Mot. Summ. J., 5; Pl.'s Dep. 80:20-22).  Second, Merritt states that when older employees left, the new persons who were brought in were much younger.  (Pl.'s Dep. 79:9-80:6).  While Merritt does not point to anybody in particular who replaced her, there is sufficient evidence to satisfy her prima facie burden.

      Harrah's counters Merritt's prima facie case with legitimate nondiscriminatory reasons for her termination: 1) Merritt's absences were placing a strain on her department; 2) she could not predict when she would return; 3) her authorized leave was exhausted; and 4) her work required her presence.  (Def.'s Mot. Summ. J.).  The burden shifts to Merritt to establish pretext.

     Merritt states that her supervisor, Wagner, made comments about her age.  (Pl.'s Dep. 80:25-81:6)  These comments included: "[y]ou're getting up there, Sal," and "[y]ou're getting older."  (Pl.'s Dep. 81:3-11).  This was allegedly repeated several times.  (*Id.*).  Merritt states that she complained to Wagner that the younger hosts were get more assignments sometime in February

2010-only a few months before she was terminated.  (Pl.'s Dep. 80:25-82:20).  Isolated comments, however, are insufficient to establish discrimination.  *See Merrick v. Farmers Ins. Group*, 892 F.2d 1424, 1438 (9th Cir. 1990).

Merritt has presented insufficient evidence of age discrimination to show that Harrahs' legitimate reasons for terminating her were pretextual.

**C. Interference with FMLA**

Merritt's claim for interference with FMLA rights survives Harrah's motion for summary judgment.  The FMLA entitles eligible employees up to twelve weeks of absences for personal or family illnesses each year. 29 U.S.C. § 2612.  The FMLA prohibits a covered employer from using FMLA leave as a negative factor in its employment decisions.  29 C.F.R. § 825.220(c).

> The regulation promulgated by the Department of Labor, 29 C.F.R. 825.220(c) plainly prohibits the use of FMLA-protected leave as a negative factor in an employment decision.  In order to prevail on her claim, therefore, [plaintiff] need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her.  She can prove this claim . . . by using direct or circumstantial evidence, or both . . . . . No scheme shifting the burden of production back and forth is required.

*Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001).  Merritt claims Harrah's used her past FMLA leave as a "negative factor" in its decision to terminate her.[6]  (Pl.'s Opp'n

---

[6] Merritt also claims that her termination occurred before her return from medical leave. (Merritt Decl., 1).  Merritt's assertion is incorrect.  First, Merritt used up all of her FMLA leave as of September 28, 2009. (Krystofiak Decl. Ex. A).  Second, Merritt's termination came on the heels of her exhaustion of HML-5 leave.  (*Id.*).  This was exhausted on May 23, 2010.  (*Id.*).

18

1  Def.'s Mot. Summ. J., 5).

2      Merritt asserts that temporal proximity may create an
3  inference that Merritt's FMLA leave was a negative factor in
4  denying her personal leave and thus her termination.  (Pl.'s Opp'n
5  Def.'s Mot. Summ. J., 5). Considering all the evidence in favor of
6  Merritt, a reasonable inference can be drawn that Harrah's
7  considered Merritt's past FMLA leaves in making its decision to
8  terminate her.

9      Harrah's motion for summary judgment cites repeated FMLA
10  approved absences over the years.  While these citations support
11  the fact that Harrah's continually granted Merritt's FMLA requests
12  and did not discourage her from taking these leaves, they also
13  reflect that Merritt was terminated soon after her approved
14  absences expired.  A reasonable inference can be drawn that
15  Harrah's took into account Merritt's past FMLA leaves in its
16  determination to terminate her employment and that this constitutes
17  a negative factor in Harrahs' decision to terminate Merritt.

18      Therefore, a genuine issue of material fact remains as to
19  whether Merritt's previous FMLA absences were a negative factor in
20  her termination on May 24, 2010.

21  **D. Breach of Contract**

22      For the same reasons that Harrah's motion for summary judgment
23  on Merritt's FMLA claim is denied, so must defendant's motion for
24  summary judgment on Merritt's breach of contract claim be denied.
25  Merritt asserts that Harrah's breached her employment contract
26  because she was terminated without cause and did not receive 26
27  weeks of severance pay.  Merritt's contractual period ran from

28                                    19

April 31, 2009 to March 31, 2011.  (Pl.'s Dep. 34:3-25).
Therefore, she was under contract when she was terminated.

Section 6(d) of Merritt's contract provides that an employee who is terminated without cause shall receive 26 weeks of salary. (Hilden Decl. Ex. 19).  Section 5(b)(viii) of the contract provides that "a breach by Employee of any material provision of this Agreement . . . or of the rules contained in the Company's Employee Handbook . . ." shall be considered a separation for cause.  (*Id.*). Harrah's has presented evidence that Harrah's attendance policy required employees to attend work unless their absence was approved.  (Pl.'s Dep. 35:21-36:9).  This policy is part of the Employee Handbook and Merritt was aware that attendance was a requirement of her position.  (Pl.'s Dep. 35:9-16).  Merritt missed one or two days following her HML-5 leave because she did not come to work.  *See e.g.* (Hilden Decl. Ex. 17).  Additionally, both she and her podiatrist indicated that she could not return until at least June 30, 2010.  (Pl.'s Dep. 47:14-48:14).

Harrah's also claims that Merritt did not give her best efforts pursuant to section 3 of the employment agreement and this constituted a material breach of the agreement.  *See* (Hilden Decl. Ex. 19).  However, issues of material fact exist as to whether Merritt gave her best efforts under section 3 of the agreement.

On the current record, a reasonable jury could infer that Merritt was terminated without cause.

**E. Tortious Breach of Implied Covenant of Good Faith and Fair Dealing**

To prevail on Merritt's tortious breach of the implied

covenant of good faith and fair dealing, plaintiff must prove: 1) contractual rights of continued employment with the defendant; 2) a relationship of trust, reliance and dependency with the defendant; 3) justified expectations of the contract that were denied; and 4) damages. *See Hilton Hotels v. Butch Lewis Productions*, 107 Nev. 226, 232-33, 808 P.2d 919 (1991); *D'Angelo v. Gardner*, 107 Nev. 704, 712-13, 819 P.2d 206 (1991).

Merritt has provided evidence she was entitled to continued employment. She was not an at will employee. Merritt was a party to an employment agreement with Harrah's, extending from April 30, 2009 to March 31, 2011. (Pl.'s Dep. 34:3-25). She was terminated on May 24, 2010. *E.g.* (Hilden Decl. Ex. 17). This evidence may support a reasonable conclusion her termination was without cause.

However, Merritt failed to establish she has a special fiduciary relationship with Harrah's. "A special relationship of reliance and dependency is not automatically deemed to exist in an employment relationship." *Alam v. Reno Hilton, Corp.*, 819 F.Supp. 905, 910 (D. Nev. 1993). She has presented no evidence to support this element of her claim.

Therefore, the court does not need to consider the other elements of her good faith and fair dealing claim. Accordingly, summary judgment is appropriate on this claim.

///

///

///

///

///

21

## IV. Conclusion

Harrahs' motion for summary judgment (#15) is **GRANTED in part** and **DENIED in part.** Harrahs' motion for summary judgment on Merritt's ADA, ADEA and tortious breach of contract claims is **GRANTED.** Harrahs' motion for summary judgment on Merritt's claim for interference with FMLA and breach of contract claims is **DENIED.**

**IT IS SO ORDERED.**

DATED: This 26th day of July, 2012.

_____
UNITED STATES DISTRICT JUDGE

22